IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stefan Stas and Loretta Stas, his     :
Wife,     :
            Appellants     :
    :   No. 734 C.D. 2019
         v.     :
    :   Submitted:  March 8, 2024
Susquehanna County Board of     :
Assessment Revisions     :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE DUMAS                             FILED:  June 17, 2024

          Stefan Stas and Loretta Stas (Taxpayers) appeal *pro se*[1] from the order

entered in the Court of Common Pleas of Susquehanna County (trial court), which

denied their appeal from the decision of the Susquehanna County (County) Board of

Assessment Revisions (Board).  Taxpayers contend they introduced sufficient

evidence in support of their claim that other comparable properties were improperly

assessed.  We affirm on other grounds.

## I. BACKGROUND[2]

          Taxpayers own a 5-acre parcel on which is their 4,300-square-foot, two-

story stucco home, built in 2005.  Trial Ct. Op., 5/14/19, at 1; Notes of Testimony

---

[1] Taxpayers were represented by counsel, and this Court granted counsel's application to withdraw before filing a counseled appellate brief.  Order, 8/15/19.

[2] We state the facts in the light most favorable to the Board as the prevailing party.  *See generally May Dep't Stores Co. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 272 A.2d 862, 867 (Pa. 1971); *Stas v. Susquehanna Cnty. Bd. of Assessment Appeals* (Pa. Cmwlth., No. 21 C.D. 2017, filed Oct. 5, 2017), 2017 WL 4413136 (resolving Taxpayers' related assessment appeal regarding their adjacent property, which has an airplane hangar and grass runway).

(N.T.), 1/24/19, at 17. For the 2018 tax year, the Board assessed the property at $167,400. Trial Ct. Op. at 3.

Following an unsuccessful Board appeal, Taxpayers appealed to the trial court, which held a *de novo* trial. *Id.* At trial, the parties agreed to the following: (1) the property's assessed value is $167,400; (2) the County's assessed value to fair market value ratio is 2.81;[3] and (3) the property's fair market value is $471,000. *Id.* at 4; N.T., 1/24/19, at 6. Taxpayers presented evidence and lay witness testimony about 38 properties that were improperly assessed in their view. In Taxpayers' view, the owners of those 38 properties were unfairly paying less taxes than Taxpayers. The Board countered with expert testimony essentially challenging Taxpayers' evidence. We discuss the parties' trial testimony in more detail below.

The trial court affirmed the Board adverse to Taxpayers. Order, 5/14/19. In relevant part, the court's order stated, "the assessed value of [the property] is $167,400." *Id.* In support, the court reasoned that Taxpayers needed expert testimony about, *inter alia*, how the 38 properties Taxpayers selected were similar to their property. Trial Ct. Op. at 9-10 & 15 n.13. Taxpayers timely appealed and filed a court-ordered statement of errors.[4] *See* Pa.R.A.P. 1925(b). In response, the trial court incorporated its prior opinion. Order, 7/9/19.

---

[3] Although the actual ratio is .355, all involved consistently referenced the equivalent reciprocal value of 2.81. For consistency, we also refer to the reciprocal values, and we discuss the ratio in more detail below, which some courts have expressed as a percentage. Also, we occasionally state rounded figures for simplicity.

[4] We construe Taxpayers' Pa.R.A.P. 1925(b) statement as timely filed. On June 13, 2019, the trial court ordered Taxpayers to comply with Rule 1925(b) within 21 days, *i.e.*, by Thursday, July 4, 2019, a holiday. Trial Ct. Order, 6/13/19. The court docketed Taxpayers' then-counsel's statement on Monday, July 8, 2019. It appears that the trial court was also closed on Friday, July 5, 2019. *Cf.* 2024 Cnty. Closings, https://www.susqco.com/departments/county-commissioners/administration (last visited June 17, 2024) (reflecting anticipated courthouse closure on Friday, July 5, 2024). As noted herein, this Court subsequently granted Taxpayers' counsel's application to withdraw.

2

## II. ISSUES

Taxpayers raise five interrelated issues, which we summarize as follows. Taxpayers begin by contending that a uniformity challenge does not require evidence of uniformity or nonuniformity of *all* properties within the county. Taxpayers' Br. at 8. Building on that contention, Taxpayers assert the trial court erred by not crediting their evidence of *selected* properties. *Id.* Taxpayers also claim the trial court erred by requiring that their evidence reflect "comparable properties in the same municipality." *Id.* Finally, Taxpayers maintain that expert testimony was not required to prove nonuniformity. *Id.* at 8-9.

## III. DISCUSSION[5]

### A. Overview of Property Tax Assessment

Before we recap Taxpayers' arguments, we summarize the property tax assessment process for context. The Pennsylvania Constitution requires that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Pa. Const. art. VIII, § 1. Courts have construed this "uniformity clause" as reflecting the principle that "a taxpayer should pay no more or no less than his proportionate share of the cost of government." *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 303 A.3d 1104, 1110 (Pa. Cmwlth. 2023) (cleaned up), *appeal granted* (Pa., Nos. 678-679 MAL 2023, filed June 12, 2024)

---

[5] "In reviewing a trial court's decision in a tax assessment appeal, we will reverse that decision only if the trial court committed an abuse of discretion, [or] an error of law, or where its decision is unsupported by the evidence." *Tech One Assocs. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 53 A.3d 685, 696 (Pa. 2012) (citation omitted). Our standard of review for questions of law is *de novo*, *id.*, and "we are generally inclined to construe *pro se* materials liberally." *Robinson v. Schellenberg*, 729 A.2d 122, 124 (Pa. Cmwlth. 1999). Finally, this Court may affirm on any basis. *Mazer v. William Bros. Co.*, 337 A.2d 559, 562 n.6 (Pa. 1975).

(*per curiam* order).[6]

To implement that principle, the taxing authority conducts countywide "property assessments in order to value a property and arrive at a basis for property taxation," *i.e.*, an assessed value.[7] *Clifton*, 969 A.2d at 1202. Such assessed values must "be based, as nearly as practicable, on the relative value of each property to [its] market value." *Id.* at 1213-14. Ideally, a property's assessed value should be equal to 100% of its market value. *Id.* at 1203. When a countywide assessment occurs every year, "uniformity is more easily achievable." *Id.*

But practically, most counties do not or cannot reassess their properties each year.[8] *Id.* Consequently, "disparities in uniformity often occur where a property is assessed at a higher percentage of fair market value than other properties in the taxing district, causing assessed values and actual, fair market values to differ,

---

[6] *Accord Appeal of Armco, Inc.*, 515 A.2d 326, 329 (Pa. Cmwlth. 1986) (*en banc*) (*Armco*) (explaining that uniformity "is met where the taxing authority assesses all property at the same percentage of its actual value; application of such a uniform ratio assures each taxpayer will be held responsible for its *pro rata* share of the burden of local government"); *Clifton v. Allegheny Cnty.*, 969 A.2d 1197, 1202 (Pa. 2009) (*Clifton*) (discussing *Del., L. & W. R. Co.'s Tax Assessment*, 73 A. 429, 430 (Pa. 1909) (*Delaware*), which stated that uniformity is achieved when the "large property owner and the small" property owner pay a proportionate share of taxes).

[7] The taxing authority assesses *all* properties, including *both* sold *and* unsold properties, to ensure uniformity. Otherwise, existing owners of unsold properties could improve their properties, which could potentially affect the assessed and fair market values. For instance, an owner of a vacant lot could build a home. But if assessment occurred only when a property was sold, then the assessed value of an unsold—yet improved—property would be unknown. This could create "disproportionality in taxation between sold and unsold properties, and between new and old owners." Assessment Law & Proc. in Pa. § 6-1 (15th ed. 2016) (Assessment Law); *see also Valley Forge Towers Apartments N, LP v. Upper Merion Area Sch. Dist.*, 163 A.3d 962, 973 (Pa. 2017) (*Valley Forge*) (holding that *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 913 A.2d 194 (Pa. 2006) (*Downingtown*), "never suggested that the *government* could divide the realty [and] systematically treat them differently" (emphasis in original)).

[8] *Accord Narehood v. Pearson*, 96 A.2d 895, 898-99 (Pa. 1953); *see also Hromisin v. Bd. of Assessment Appeals of Luzerne Cnty.*, 719 A.2d 815, 818 (Pa. Cmwlth. 1998) ("Obviously, however, perfect uniformity is not possible since property values fluctuate continuously, and far more frequently than taxing authorities could conceivably perform county-wide reassessments.").

4

often dramatically." *Id.* (cleaned up). Thus, upon perceiving disparities, a taxpayer may raise a uniformity challenge.

### 1. Challenges to Assessment Uniformity

A taxpayer may challenge uniformity in at least two ways. First, a taxpayer may claim that the taxing authority *overassessed* the *taxpayer's property* such that the taxpayer is paying more taxes than owners of other comparable properties. *Downingtown*, 913 A.2d at 199 (explaining that it is well settled "that a taxpayer is entitled to relief . . . where his property is assessed at a higher percentage of fair market value than other properties throughout the taxing district").[9] Second, a taxpayer may claim that the taxing authority *underassessed other comparable properties*, such that those owners are paying less taxes than the taxpayer, *i.e.*, the taxpayer is paying more than its fair share of taxes. *Albarano v. Bd. of Assessment & Revision of Taxes & Appeals, Lycoming Cnty.*, 494 A.2d 47, 49 (Pa. Cmwlth. 1985) (explaining that the taxpayer must prove "that a lower ratio of assessment to actual value has been applied to comparable properties").[10]

---

[9] *Accord Valley Forge*, 163 A.3d at 973; *Clifton*, 969 A.2d at 1201, 1206-07 (noting the taxpayers' uniformity challenge based on their overassessed properties); *Beattie v. Allegheny Cnty.*, 907 A.2d 519, 520 (Pa. 2006); *Bradford Twp. Taxpayers Protective Ass'n v. McKean Cnty. Bd. of Assessment & Revision of Taxes*, 88 A.2d 782, 783 (Pa. 1952) (commenting that taxpayers claiming overassessment of their properties in comparison to other properties may allege lack of uniformity); *Chartiers Valley Indus. & Com. Dev. Auth. v. Allegheny Cnty.*, 963 A.2d 587, 590 (Pa. Cmwlth. 2008) (*Chartiers*).

[10] *Accord Downingtown*, 913 A.2d at 204 n.16 (stating a constitutional violation occurs when a taxpayer shows "that his property was assessed at its true value while other properties were intentionally undervalued" (cleaned up)); *Fosko v. Bd. of Assessment Appeals, Luzerne Cnty.*, 646 A.2d 1275, 1279 (Pa. Cmwlth. 1994); *Banzhoff v. Dauphin Cnty. Bd. of Assessment Appeals*, 606 A.2d 974, 976 n.3 (Pa. Cmwlth. 1992). Framed differently, a "uniformity challenge admits that the fair market value assigned to the [complaining taxpayer's] property is correct; in essence, it is an allegation that other comparable properties are assigned a fair market value substantially lower than their actual fair market value so that when the ratio is applied to this lower value, owners of comparable property pay less than the complaining taxpayer." *Banzhoff*, 606 A.2d at 976 n.3; *Fosko*, 646 A.2d at 1279 (same).

Both uniformity claims, however, essentially require the same proof regardless of whether the taxpayer claims that its *own* property was overassessed or that *other* comparable properties were underassessed. The taxpayer must establish that comparable "properties are assessed for less than the" taxpayer's property.[11] Assessment Law § 7-2.

### 2. Standards of Testing Assessment Uniformity

In resolving the occurrence of such "disparities in uniformity," *i.e.*, whether properties have been over- or underassessed, at least four standards exist "for measuring whether a system of property valuation produces sufficiently uniform results." *Clifton*, 969 A.2d at 1214. Of those four standards, we briefly discuss the common level ratio (CLR).

"CLR is the ratio of assessed value to current market value used generally in the county." *Id.* at 1215 (cleaned up); *accord* Section 102 of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020-102. The State Tax Equalization Board (STEB) calculates a county's CLR "based on sales information furnished by the county, as well as by independent appraisal

---

[11] To be clear, our jurisprudence contextually differentiates the term "comparable properties." In the context of "determining uniformity[,] the ratios of assessed values to market values of all properties are all relevant, and hence, in that sense all properties are comparables." *McKnight Shopping Ctr., Inc. v. Bd. of Prop. Assessment, Appeals & Rev. of Cnty. of Allegheny*, 209 A.2d 389, 392-93 (Pa. 1965) (*McKnight*) (cleaned up). But in the context of "determining the market value of a specific property," the term "comparable properties" "means properties of a similar nature which have been recently sold." *Id.* at 393; *accord Downingtown*, 913 A.2d at 199 (emphasizing that "all properties in the relevant taxing district are comparable properties for purposes of calculating the appropriate ratio of assessed value to market value (as all real estate is a class which is entitled to uniform treatment)" but that "in the context of a uniformity challenge, the parties and the trial court may rely upon evidence concerning the assessment-to-value ratio of similar properties"). In sum, a taxpayer's uniformity challenge requires evidence of properties comparable to the taxpayer's property. *Downingtown*, 913 A.2d at 199; *Valley Forge*, 163 A.3d at 974 (stating that permitting the taxpayer to introduce evidence of comparable properties does not "empower[] the government to systematically engage in disparate treatment of sub-classifications of property"). We discuss what constitutes "comparable properties" below.

6

data and other relevant information." *Clifton*, 969 A.2d at 1215 (citation omitted).

CLR, however, "is *not* indicative of uniformity." *Id.* at 1216 (emphasis added). For example, a CLR of 1.67 may reflect properties assessed at between 55% to 65% "of their fair market value, which would not necessarily violate the Uniformity Clause because some practical inequalities are anticipated, and rough uniformity with a limited amount of variation is permitted." *Id.* (cleaned up). But a CLR of 1.67 could *also* reflect properties assessed at between 30% to 90% of their fair market value, which suggests non-uniformity.[12] *Id.* Nevertheless, despite its flaws, a taxpayer can use CLR "to demonstrate that his property has been over-assessed, as it allows him to compare the assessed-to-market value ratio of his property to the average ratio throughout the district." *Id.* (footnote omitted).[13]

In sum, the taxing authority must uniformly assess all properties so that each taxpayer pays a proportionate share of the overall tax burden. *See, e.g.*, *Armco*, 515 A.2d at 329. A taxpayer alleging that it pays a disproportionate share of taxes must "establish the various valuations at issue, and then demonstrate how the disparate ratios of assessed-to-market value violate the uniformity requirement."

---

[12] The reciprocal of 1.67 is .6 (or 60%), which is the mean between 55 and 65, as well as 30 and 90. Our Supreme Court explained that because CLR reflects an average, it has "limited significance" when "similarly situated property owners . . . are underrepresented in the general population . . . ." *Downingtown*, 913 A.2d at 201-02 (cleaned up). Plainly, if similarly situated, underrepresented properties are assessed at 30% or 90% of their fair market values, then non-uniformity potentially exists. *See id.*

Further, CLR "is based *only* on the ratio for properties in a county that have been sold for a bona fide price during a particular [tax] year. Moreover, the STEB ratio represents an *average* ratio for those properties; the STEB ratio does *not* represent the ratio at which *all* properties in a county are taxed in a particular [tax] year." *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 819 A.2d 615, 624 (Pa. Cmwlth. 2003) (*en banc*) (Friedman, J., dissenting) (emphases in original), *rev'd*, *Downingtown*, 913 A.2d 194.

[13] Unlike CLR, which is not an ideal indicator of uniformity, the coefficient of dispersion and price-related differential standards are "widely accepted statistical indicator[s] of uniformity." *Clifton*, 969 A.2d at 1216.

7

*Clifton*, 969 A.2d at 1214. There are several methods of measuring uniformity, including CLR. *Id.* at 1215-17.

### B. Parties' Arguments

Before summarizing the parties' arguments, we further discuss the parties' trial testimony to provide context. The Board began the trial by presenting Robert Hyde as its expert, and he testified about the Board's assessment of Taxpayers' property. N.T., 11/5/18, at 10-12. In response, Stefan Stas testified as a lay witness about 38 property sales that occurred between May 2017 and May 2018. *Id.* at 19, 28. Per Stas, these 38 properties incurred significantly lower taxes than Taxpayers' property. *Id.* at 23, 28-29; *accord* Trial Ct. Op. at 4.

Stas testified that he selected properties that were "relatively similar" to Taxpayers' property and that had a market value of $250,000 or more because, in his view, "for the purposes of uniformity, all properties are equal." N.T., 11/5/18, at 70. Stas testified about the assessed values and ratios for each of the 38 selected properties. *Id.* at 68-89. Stas opined that the average of the assessed value to market value ratios of those 38 properties was 5.14. *Id.* at 55. In other words, Stas asserted that because the average ratio should have been around 2.81, he demonstrated that the Board should have been assessing those comparable properties at higher values. *See id.*

The Board cross-examined Stas on whether the 38 properties were comparable to Taxpayers' property. Stas replied that those properties were comparable because they were sold within the County. *Id.* at 108; *see also id.* at 31 (reflecting Taxpayers' counsel's argument that "comparable" properties were properties that sold for over $250,000 within the County). Beyond that criterion, Stas generally could not explain why the 38 properties were comparable to

8

Taxpayers' property. *Id.* at 90-108.

Stas also did not know if any of the 38 property sales "were validated as comparable sales" by STEB. *Id.* at 108. For example, a valid sale is an arms' length transaction. N.T., 1/24/19, at 39, 41. In contrast, an invalid sale includes a partial sale, an intra-family sale, or a sale that includes natural gas royalties. *Id.* at 40-41.

In rebuttal, the Board presented Hyde, who testified that there were 29,000 properties in the County. *Id.* at 32. Of those 29,000 properties, Hyde testified that 734 sales occurred for the relevant 12-month period. *Id.* at 7-8. Hyde explained that of the 734 total sales, 84 sales occurred within Taxpayers' school district, 14 of which were within Taxpayers' township. *Id.* at 8-9. Of those 14, Hyde stated that some sales were invalid. *Id.* at 9.[14]

With respect to Stas's 38 sales, Hyde explained that STEB did not consider 18 of those sales for various reasons. *Id.* at 7-8, 39, 41, 59. In any event, Hyde further discussed each of the 38 sales and explained why none of them involved comparable properties. *Id.* at 16-32. For example, the properties were larger, not located in Taxpayers' neighborhood, or substantially different, *e.g.*, located on a lake or vacant. *Id.* Further, the homes on the properties were typically older or smaller than Taxpayers' home or constructed of materials different from Taxpayers' home, *e.g.*, a log cabin. *Id.* Of Stas's 38 sales, only 2 properties were located in Taxpayers' township, but neither were comparable properties. *Id.* at 27,

---

[14] For instance, an intra-family sale for $1 would not reflect a property's fair market value. Plainly, a taxpayer selecting *only* intra-family $1 sales could not establish non-uniformity. We add that Hyde testified that of 734 sales, the County excluded around 160 because the properties were vacant, exempt, commercial, or industrial properties. *See* N.T., 1/24/19, at 8-9. To be precise, Hyde testified that the County excluded "approximately 140," which would leave 594 sales. *Id.* at 8. Because Hyde consistently testified about 577—not 594—sales, we presume Hyde misspoke when he said "140." *Id.*

29.

For example, we summarize the parties' testimony regarding Stas's "property #1," for which the assessed value was $162,800, and the sales price was $1,550,000. N.T., 11/5/18, at 55-56. Stas testified that the property was around 100 acres in size, located in a municipality different from Taxpayers, and had a preferential tax status.[15] *Id.* at 90. Stas did not know (1) if natural gas rights were part of the sale or (2) the sale price of the building on the property. *Id.* at 56-57. Stas emphasized that the size of the property was immaterial. *Id.* at 90-91. Nevertheless, Stas explained that the ratio between the assessed value of $162,800, and the fair market value of $1,550,000, was 9.52. *Id.* at 56-57, 70.

But because the County's ratio is 2.81, in Stas's view, the sales price to assessed value ratio for property #1 should reflect 2.81 and not 9.52. *See id.* at 42. In other words, for property #1, Stas contends that the Board erred by *underassessing* the property at $162,800 and that it should have assessed the property at $551,601. *See id.* Assessing property #1 at $551,601 would more accurately reflect a 2.81 ratio, *i.e.*, $551,601 * 2.81 = $1,550,000. *See id.* In Stas's view, this sale, among others, demonstrates that the Board is *underassessing* comparable properties, *i.e.*, such properties are being taxed *less* than Taxpayers' property. *See id.* In other words, Taxpayers are paying more than their fair share of taxes.

In response, Hyde disputed Stas's characterization of property #1 as misleading. Hyde countered that property #1 is 103 acres, located in Ararat Township, and the home on the property is made of logs. N.T., 1/24/19, at 16-17. Hyde testified property #1 "in no way reflects" Taxpayers' property, which is 5 acres,

---

[15] The Board's counsel asked whether "property #1" was in "clean and green," which is a preferential tax status. *See* Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §§ 5490.1-5490.13 (commonly known as the Clean and Green Law).

10

located in Lenox Township, and the home on the property is made of stucco. *Id.* at 17. Although property #1 was a valid "arm's length" sale, Hyde maintained that property #1 was not comparable to Taxpayers' property, which is "not near" Ararat Township.[16] *Id.* at 9, 16-17.

Of the two valid sales in Lenox Township, Hyde opined that the first sale did not involve a comparable property because the home was one-story high and built in 1977. *Id.* at 27. Hyde testified that the other valid sale was also not a comparable property because the home was built in 1979, and had a different building material, layout, and square footage.[17] *Id.* at 29. Having summarized the parties' testimony, we turn to Taxpayers' arguments.

We group Taxpayers' arguments as follows: (1) challenges to the trial court's analysis, and (2) contentions that the court should have credited Stas's testimony. With respect to the first group, Taxpayers argue that because "all properties in the relevant taxing district are comparable properties constituting a class," they could select *any* property within the County "for comparison purposes." Taxpayers' Br. at 16-18 (citation omitted). They could select any County property, Taxpayers reason, because *Downingtown* emphasized that it would be impossible for a taxpayer "to evaluate the assessment-to-value ratio of every County property." *Id.* at 19 (emphasis omitted). Thus, Taxpayers assert that the trial court erred by requiring evidence of comparable properties within their neighborhood. *Id.* at 17.

Relatedly, Taxpayers maintain that the 38 properties they selected were comparable because they had market values similar to Taxpayers' property, in the

---

[16] It appears Ararat Township is roughly 20 miles from Lenox Township.

[17] Although Hyde did not elaborate, the record reflects that the 1977 home was constructed of brick and is around 2,000 square feet. *See* Taxpayers' Ex. 2. Similarly, the record provides that the 1979 home was built of wood and around 1,800 square feet. *See id.* As noted herein, Taxpayers' home was built in 2005, and is 2 stories high, made of stucco, and around 4,300 square feet.

sense that they all sold for between $300,000 to over $1 million. *Id.* at 19.[18] Further, Taxpayers quote caselaw for the proposition that they could "select a number of recent representative sales and offer testimony with respect to such sales as proof of the ratio in the taxing district." *Id.* at 26 (quoting *Deitch Co. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 209 A.2d 397, 403 (Pa. 1965)). Taxpayers define the term "a number" as "several." *Id.* at 27. Taxpayers assert that 38 is more than "several," *i.e.*, a sufficiently large sample. *Id.* Finally, Taxpayers maintain that expert testimony was not required to show how the selected properties were comparable to Taxpayers' property. *Id.* at 21, 23, 32.

As for the second group, Taxpayers assert that the trial court was required to consider their "unequivocal evidence of non-uniformity." *Id.* at 20. Taxpayers reiterate that they presented evidence of the assessment-to-value ratios of similar properties. *Id.* at 20-21. Taxpayers contend that the County's own evidence of 577 sales reflects a wide range of ratios, which proves non-uniformity. *Id.* at 35.[19]

The Board counters by discussing how Taxpayers' brief violated various rules of appellate procedure. Board's Br. at 20-23 (noting this Court has been "historically forgiving" of any such violations). On the merits, the Board states that Taxpayers should have presented a representative survey of an "ample number of properties" demonstrating non-uniformity. *Id.* at 25. The Board emphasizes that Taxpayers failed to explain how their 38 selected properties were comparable to Taxpayers' property. *Id.* at 25-26.

_____

[18] Stas had testified to a different figure of $250,000. N.T., 11/5/18, at 70.

[19] Taxpayers also challenge several of the trial court's findings as irrelevant. Taxpayers' Br. at 29-32. Because of our disposition, we need not address these arguments. Taxpayers also discuss, and we cannot consider, a document that was not presented to the trial court. *Id.* at 37 (quoting from a handbook allegedly titled "Pennsylvania Property Assessment: A Self-Evaluation Guide For County Officials of June 13, 2018"); *see Twp. of Bristol v. 1 Enters., LLC*, 177 A.3d 1045, 1049 (Pa. Cmwlth. 2018) (noting "it considered only documents in the trial court record").

## C. Discussion

As noted above, "in determining uniformity[,] the ratios of assessed values to market values of all properties are all relevant, and hence, in that sense all properties are comparables." *McKnight*, 209 A.2d at 392-93 (cleaned up). But "comparable properties" does not mean a taxpayer may select *any* property within the county: the taxpayer must select "similar properties of the same nature in the neighborhood." *Downingtown*, 913 A.2d at 199 (cleaned up). Such properties do not have to be identical to the taxpayer's property. *McKnight*, 209 A.2d at 393. Rather, comparisons "may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways."[20] *Id.*

Evidence of comparable neighborhood properties, in turn, are categorized as follows: (1) evidence of actual sales, and (2) evidence of unsold properties. With respect to the first category, a taxpayer could present "evidence establishing the ratios of assessed values to market values of comparable properties based upon *actual* sales of comparable properties in the taxing district for a reasonable time prior to the assessment date." *Fosko*, 646 A.2d at 1279 (emphasis added). In other words, a taxpayer could present the ratios of recently sold

---

[20] Precisely, the *McKnight* Court defined "comparable properties" as recently sold properties. *McKnight*, 209 A.2d at 393. But our jurisprudence explicitly permits evidence of unsold comparable properties. *See, e.g.*, *Deitch*, 209 A.2d at 400, 403; *Fosko*, 646 A.2d at 1279. The *McKnight* Court did not define "income and expense." In any event, the Court explained that "in reviewing sales of other properties, 'to compare' means to examine the characters or qualities of one or more properties for the purpose of discovering their resemblances or differences. The aim is to show relative values by bringing out characteristic qualities, whether similar or divergent." *McKnight*, 209 A.2d at 393. Notably, the assessed and market values cannot form the *sole* bases for identifying comparable properties. For example, such values may be identical in comparing a small urban office building to a large beachfront home. It appears to follow that a taxpayer's claim that the taxing authority is disparately treating similarly situated taxpayers necessarily requires an "apples-to-apples" comparison.

comparable properties. *See id.* With respect to the second category, a taxpayer could present the ratios of comparable unsold properties. *Id.* (stating that a taxpayer may offer "evidence of assessments of comparable properties, so long as the taxpayer also presents evidence to show that the actual fair market value of the comparable properties is different than that found by the taxing authority" (citations omitted)).[21] In sum, a taxpayer must present "credible, relevant and competent evidence" of the ratios of *comparable* properties (either recently sold, not sold, or perhaps both). *Id.*

Courts have resolved challenges directed to a taxpayer's presentation of such evidence or lack thereof. For example, in *Chartiers*, this Court resolved a uniformity challenge brought by the owners of an office building in downtown Pittsburgh. *Chartiers*, 963 A.2d at 588. The taxpayers stipulated that the assessed value was equal to its fair market value. *Id.* at 589. Notwithstanding the stipulation, the taxpayers contended that their building's assessed value should be *less* than its fair market value because *other* properties were being assessed at less than their fair market value. *Id.* at 588-89. In support, the taxpayers presented, via a lay witness, evidence purportedly establishing the underassessment of other properties: 15 recent sales of primarily single-family homes. *Id.* The trial court denied relief, and the taxpayers appealed to this Court.

The taxpayers argued, *inter alia*, "that *all* property including *both*

---

[21] *Accord Deitch*, 209 A.2d at 400, 403 (reflecting the two discrete evidentiary categories); *Valley Forge Golf Club, Inc. v. Bd. for Assessment & Revision of Taxes of Montgomery Cnty.*, 285 A.2d 213, 215 (Pa. Cmwlth. 1971) (*Golf*) (resolving uniformity challenge for a golf course by comparing the assessed values of the other 44 county golf courses). The *Golf* Court noted that the taxpayer presented the assessments of those 44 golf courses but "produced no evidence" of the fair market value of those courses. *Id.* at 215. Without evidence that the market values of those other golf courses "were worth more than the amounts fixed" by the taxing authority, the Court held that the taxpayer failed its burden of proving non-uniformity. *Id.* *Golf* underscores that absent a recent sale of a comparable golf course, which would have signaled a fair market value, the taxpayer should present evidence of the market values of unsold golf courses. *See id.*

commercial and residential is comparable for applying a proper ratio to the fair market value as determined." *Id.* at 590-91 (emphases added). This Court disagreed, emphasizing that a uniformity challenge required the taxpayers to "prove lack of uniformity by presenting evidence of the assessment-to-value ratios of *similar properties of the same nature in the neighborhood*." *Id.* at 592 (emphasis in original and cleaned up). The Court held that the taxpayers' evidence, *i.e.*, single-family homes located outside of downtown Pittsburgh, could not prove that the taxpayers' office building was overassessed in comparison to other office buildings in downtown Pittsburgh. *Id.* at 592-93.[22]

Relatedly, a taxpayer may present their evidence via expert testimony. But a taxpayer is *not* required to present expert testimony. *See Valley Forge*, 163 A.3d at 973 (noting that a taxpayer may prove non-uniformity "through evidence, *often* in the form of expert testimony" (emphasis added)); *Downingtown*, 913 A.2d at 200 (observing that expert testimony may not necessarily be required with respect to challenges involving STEB's CLR). A party, of course, may always challenge the competency of a lay witness's testimony. *See generally* Pa.R.E. 701-702.

Instantly, Taxpayers argued they could select *any* property within the County to compare with their property.[23] Our Supreme Court has rejected a similar argument because "comparable properties" are "similar properties of the same nature in the neighborhood"—not *any* property within the County. *See Downingtown*, 913

---

[22] *Accord Appeal of 322 Blvd. Assocs.*, 600 A.2d 630, 633 (Pa. Cmwlth. 1991) (holding, in a uniformity challenge, that the taxpayer's evidence of the assessment of neighboring properties should have been admitted); *Albarano*, 494 A.2d at 49 (stating a "property owner claiming that his assessment is not uniform must carry his burden of proof by showing that a lower ratio of assessment to actual value has been applied to comparable properties" (citations omitted)); *McKnight*, 209 A.2d at 391 (discussing evidence of comparable shopping centers in the area).

[23] To the extent the Board argues waiver based on Taxpayers' numerous violations of the appellate briefing rules, we decline to find waiver. Taxpayers' appellate brief was not so deficient as to bar meaningful appellate review. *See* Pa.R.A.P. 105.

A.2d at 199; *Chartiers*, 963 A.2d at 592.

To the extent that Taxpayers contend their selected properties were comparable because they had similar market values to Taxpayers' property, we also disagree. Comparable properties are properties of similar "location, age and condition of improvements, income and expense, use, size, [and] type of construction." *See McKnight*, 209 A.2d at 393. Taxpayers' reliance on solely market value is akin to the *Chartiers* taxpayers' reliance on sales of single-family homes outside of downtown Pittsburgh, which were simply dissimilar to the downtown Pittsburgh office building at issue. *See Chartiers*, 963 A.2d at 592. Taxpayers did not otherwise explain how the 38 properties—most of which were not in Taxpayers' neighborhood—were comparable to Taxpayers' 4,300-square-foot, two-story stucco home, which was constructed in 2005 on a 5-acre parcel. At the very least, Taxpayers had to present evidence of *comparable* properties, as in *Golf*, in which the taxpayer challenged the assessment of its golf course with evidence of the other 44 golf courses in the county. *See Golf*, 285 A.2d at 215.[24]

As for Taxpayers' contention that the County's own evidence of the ratios of 577 sales reflects non-uniformity, we respectfully disagree. We disagree because Taxpayers challenged whether *other comparable* properties were underassessed as compared to *Taxpayers' property*. *See Albarano*, 494 A.2d at 49. Taxpayers needed to show that a material number of those sales were of comparable properties.

---

[24] The *Golf* taxpayer's challenge failed, however, because the taxpayer failed to sufficiently challenge the market values for the 44 golf courses. *Golf*, 285 A.2d at 215. Because Taxpayers failed their burden of presenting evidence of properties *comparable* to Taxpayers' property, we need not address their necessarily derivative contentions that 38 properties was a sufficiently large sample size and was "unequivocal evidence of non-uniformity." *See* Taxpayers' Br. at 20, 27; *McKnight*, 209 A.2d at 393. Simply, we must ensure we are comparing apples to an apple or else we risk comparing 38 oranges to an apple.

To the extent the trial court suggested that expert testimony was *required*, we agree that was error. Our tax assessment jurisprudence encourages, but does not mandate, expert testimony. *See Valley Forge*, 163 A.3d at 973; *Downingtown*, 913 A.2d at 200; *accord* Bd.'s Br. at 19 (stating "expert testimony is not required *per se* in property tax assessment uniformity challenges").

In sum, Taxpayers failed to present evidence that the 38 properties were *"similar* properties of the same nature in the neighborhood." *Downingtown*, 913 A.2d at 199 (emphasis added). Other than market values, Taxpayers could not explain how such properties were comparable to Taxpayers' property. Without such evidence, Taxpayers could not prevail on their uniformity claim. *See id.*; *Chartiers*, 963 A.2d at 592.

## IV. CONCLUSION

For these reasons, we affirm on different grounds. *See Tech One Assocs.*, 53 A.3d at 696; *Mazer*, 337 A.2d at 562 n.6. The trial court erred to the extent it suggested that expert testimony was required. *See, e.g.*, *Valley Forge*, 163 A.3d at 973. Nevertheless, we agree with the Board that Taxpayers failed to explain how the 38 properties they selected were comparable to Taxpayers' property. *See Downingtown*, 913 A.2d at 199; *McKnight*, 209 A.2d at 393; *Chartiers*, 963 A.2d at 592.

---

LORI A. DUMAS, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Stefan Stas and Loretta Stas, his Wife, | : | |
| Appellants | : | |
| | : | No. 734 C.D. 2019 |
| v. | : | |
| | : | |
| Susquehanna County Board of Assessment Revisions | : | |

# **O R D E R**

AND NOW, this 17th day of June, 2024, we AFFIRM the May 14, 2019 order entered by the Court of Common Pleas of Susquehanna County in favor of the Susquehanna County Board of Assessment Revisions.

LORI A. DUMAS, Judge